UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA DIBELLA,

                Plaintiff,             Civil Action No. 21-11142

v.                                  Mark A. Goldsmith
                                  United States District Judge

COMMISSIONER OF             David R. Grand
SOCIAL SECURITY,          United States Magistrate Judge

                Defendant.
_____/

**REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 13)**

Plaintiff Debra Dibella ("Dibella") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF Nos. 11, 13), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.**     **RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Dibella is not disabled under the Act. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 13)** be **GRANTED**, Dibella's Motion for Summary Judgment **(ECF No. 11)** be **DENIED**, and that pursuant to sentence four of 42 U.S.C. §

405(g), the ALJ's decision be **AFFIRMED**.

## II.    REPORT

### A.    Background

Dibella was 55 years old at the time of filing her applications on May 20, 2019. (PageID.222, 228).[1]   At 5'2" tall, she weighed approximately 170 pounds during the relevant time period.  (PageID.107).  She completed high school, where she had attended special education classes, and some college.  (PageID.70, 268).  She currently lives with her parents.  (PageID.70).  Previously, Dibella worked as a telephone call center operator, cafeteria manager, and deli cutter/slicer.  (PageID.58).  Dibella's alleged disabling conditions include fibromyalgia, back problems, memory issues, problem concentrating, brain fog, insomnia, inability to sit or stand for a half hour, neck problems, forgetfulness, and anxiety.  (PageID.267).  She alleged a disability onset date of May 17, 2019. (PageID.222, 228).

After Dibella's applications for SSI and DIB were denied at the initial level on September 25, 2019 (PageID.135, 144), she timely requested an administrative hearing, which was held on October 20, 2020, before ALJ Beth J. Contorer (PageID.64-106). Dibella, who was represented by attorney Donald Shiffman, testified at the hearing, as did vocational expert ("VE") Scott Silver.  (*Id.*).  On November 9, 2020, the ALJ issued a written decision finding that Dibella is not disabled under the Act.  (PageID.45-59).  On April 12, 2021, the Appeals Council denied review.  (PageID.34-39).  Dibella timely filed

---

[1] Standalone citations to "PageID. __" are all to the administrative transcript in this case, which can be found at ECF No. 9.

for judicial review of the final decision on May 19, 2021.  (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Dibella's medical record, function and disability reports, and testimony as to her conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### B.     The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

3

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at \*7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Dibella is not disabled under the Act.  At Step One, the ALJ found that Dibella had not engaged in substantial gainful activity since the alleged onset date of May 17, 2019.  (PageID.50).  At Step Two, the ALJ found that Dibella had severe impairments of obesity, fibromyalgia, and degenerative disc disease of the lumbar spine.  (PageID.51).  At Step Three, the ALJ found that Dibella's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (PageID.53).

The ALJ then assessed Dibella's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional limitations: she is occasionally able to perform all postural activities, except unlimited in her ability to balance; and she must avoid hazards, such as unprotected heights and operation of heavy machinery.  (PageID.53).

At Step Four, the ALJ found that Dibella is capable of performing her past relevant work as a "telephone call center operator" and "manager – industrial cafeteria." (PageID.58). Thus, the ALJ concluded that Dibella was not disabled under the Act. (*Id.*).

### C.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). The phrase "substantial evidence" is a "term of art …." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id*. (internal citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence …  is 'more than a mere scintilla.'" *Id.* (internal citations omitted). Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d

680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**D.    Analysis**

In her motion for summary judgment, Dibella makes three arguments challenging the ALJ's handling of evidence concerning her "mental-related limitations."  It bears noting at the outset, however, that all of her arguments essentially stem from the ALJ's determination that her ***non-severe*** impairment of anxiety[2] "does not cause more than minimal limitation in [her] ability to perform basic mental work activities" and, thus, does not affect her RFC to perform the "mental demands" of her past relevant work "as actually and generally performed."  (PageID.51, 58).

---

[2] Dibella does not challenge the ALJ's finding that her anxiety is non-severe and, thus, waived any challenge to this finding.  *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (undeveloped claims are waived).

First, Dibella argues that the ALJ erred by failing to properly assess the "persuasiveness of the neuropsychological evaluation" from her neuropsychologist, Dr. Dana Connor, PhD.  (ECF No. 11, PageID.734-40).  Next, Dibella asserts that substantial evidence does not support the ALJ's assessment of medical opinions from the state agency doctor, Dr. Jerry Csokasy, PhD, as well as her treating physician, Dr. Prizy Job, MD.  (*Id.*, PageID.740-44).  Finally, Dibella contends that substantial evidence does not support the ALJ's decision because the ALJ failed to consider the effects of her "mild mental limitations" on her RFC.  (*Id.*, PageID.744-46).  For the reasons discussed below, these arguments lack merit.

1.  *Dibella Fails to Show that the ALJ Committed Reversible Error in Assessing Dr. Connor's Neuropsychological Evaluation*

Dibella first argues that the "ALJ never evaluated the persuasiveness of the neuropsychological evaluation from Dr. Connor . . . [p]erhaps [because] [the ALJ] did not feel that this was a 'medical opinion.'"  (ECF No. 11, PageID.736).  Dibella, however, "submits that Dr. Connor's assessment meets [the regulation's] definition" of a medical opinion, given that Dr. Connor "performed a battery of tests assessing [her] psychiatric and cognitive functioning, and offered various recommendations based on this testing."  (*Id.*, PageID.737).  The Commissioner responds that the ALJ was not required to assess the persuasiveness of Dr. Connor's evaluation because it was not a "medical opinion" as defined under 20 C.F.R. § 404.1513(a)(2), but that the ALJ otherwise considered all of Dr. Connor's clinical findings, which support the ALJ's finding of "no more than mild mental limitations."  (ECF No. 13, PageID.758-62).

7

Relevant to Dibella's application filed in May 2019, 20 C.F.R. § 404.1513(a)(2) states that "[a] medical opinion is a statement from a medical source about ***what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in ... [y]our ability to perform mental demands of work activities***, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." 20 C.F.R. § 404.1513(a)(2) (emphasis added). When evaluating medical opinions, the applicable regulations further provide that ALJs must rely on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(c). Among these, "the most important factors" in this analysis are a medical opinion's supportability and consistency with other sources in the record. *Id.* § 404.1520c(b)(2).

At issue here is Dr. Connor's "clinical neuropsychological evaluation" of Dibella on July 16, 2019, based on a referral for an assessment of Dibella's "current cognitive functioning in light of patient-reported memory difficulties." (PageID.416). As discussed below, a review of the record confirms that Dibella fails to show any reversible error in the ALJ's handling of Dr. Connor's evaluation.

First, while Dibella "submits" that Dr. Connor's evaluation meets the definition of a medical opinion because Dr. Connor "performed a battery of tests assessing Dibella's psychiatric and cognitive functioning, and offered various recommendations based on this testing" (ECF No. 11, PageID.737), the applicable regulations do not broadly define a medical opinion as a performance of "tests" and "recommendations," but as a specific

statement about what the claimant "can still do despite [her] impairment(s) and whether [she has] one or more impairment-related limitations or restrictions in [certain specified abilities]," including her "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting . . ." 20 C.F.R. § 404.1513(a)(2), (a)(2)(ii).  Here, Dibella fails to point to any *specific* statement in Dr. Connor's neuropsychological evaluation regarding a mental functional limitation in work activities such that it would constitute a "medical opinion" as defined under § 404.1513(a)(2).  Instead, she asserts that Dr. Connor "noted that a separate *objective* measure of personality and psychological functioning was consistent with an individual experiencing significant somatic concerns, interpersonal difficulties, hostility, emotional lability, stress/anxiety, low mood, and poor-self concept."  (ECF No. 11, PageID.737) (emphasis in original).

But, even assuming the above can be considered diagnoses, the mere diagnosis of an impairment does not say anything about its *functional limitations*, which the claimant has the burden of proving.  *See, e.g., Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis ... of course, says nothing about the severity of the condition."); *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 589 (6th Cir. 2019) ("Disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.").[3]  Rather, Dibella's argument primarily hinges on her contention that Dr. Connor

---

[3] To the extent Dibella broadly asserts that Dr. Connor "identified isolated weaknesses and impaired scores in areas such as problem solving and verbal set-shifting," Dibella merely contends

recommended "she should 'avoid multi-tasking whenever possible' and should 'allow

extra time to complete tasks and take regular breaks to maximize cognitive efficiency.'"

(ECF No. 11, PageID.737).  Dibella's reliance on such recommendation is misplaced, as

she ignores the context surrounding Dr. Connor's statements.  Relevant here, Dr. Connor

recommended in her evaluation that Dibella:

> Continue to utilize compensatory strategies that have been useful such as keeping a calendar of bill due dates and using grocery lists. ***In addition, she may find benefit from the following strategies that can be useful even for those with normal cognitive functioning***: a. Repeat exposure to important information ... b. Maintain a consistent schedule so that attention and memory needs are minimized for everyday tasks ... d. Write down important information. ... ***e. Avoid multi-tasking whenever possible.  Allow extra time to complete tasks and take regular breaks to maximize cognitive efficiency.***

(PageID.417) (emphasis added).  When read in full context, it is clear that the Dr. Connor's

above recommendation is not an assessment of a specific functional limitation in Dibella's

mental ability to perform work activities, but merely a suggestion of "strategies" that

"may" be "useful" to Dibella and "benefit" her in "maximiz[ing] ... cognitive efficiency."

(*Id.*) (emphasis added).  As such, Dr. Connor's evaluation was not a "medical opinion" as

defined under § 404.1513(a)(2), and so the ALJ was not required to specifically assess its

persuasiveness in accordance with 20 C.F.R. § 404.1520c(c).

Dibella's alternative argument – that "[e]ven if this Court finds that Dr. Connor's

report was *not* a medical opinion . . . the ALJ was still required to consider Dr. Connor's

_____

that such findings, in general, "could *conceivably* affect work-related functioning and ability to multi-task in a work setting," without any meaningful explanation as to how such findings were required to be construed as opinions on *specific* work-related functional limitations, much less their *severity*.  (ECF No. 14, PageID.780-81) (emphasis added).

findings" – fairs no better, as the ALJ clearly did consider them.  Indeed, Dibella concedes in her motion that "the ALJ mentioned some of Dr. Connor's findings in the decision," and that "[a]n ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party." (ECF No. 11, PageID.738 (quoting *Kornecky*, 167 F. App'x at 508).  To the extent she argues in conclusory fashion that "[t]he findings and resulting recommendations from Dr. Connor were particularly important," she fails to explain their particular importance, much less how they identify and prove the existence of any specific functional limitations the ALJ should have assessed.  *See Lee v. Comm'r of Soc. Sec.*, No. 19-10337, 2020 WL 1139710, at *6 (E.D. Mich. Mar. 9, 2020) (stating the claimant "bears the burden of proving the existence and severity of limitations caused by [her] impairments" and "that [s]he has a more restrictive RFC than that assessed by the ALJ") (citing *Jones*, 336 F.3d at 474, and *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)).

Finally, the record belies Dibella's contention that "[t]he ALJ's decision does not indicate that she acknowledged any positive objective findings in Dr. Connor's report, or any recommendations that would be inconsistent with or in excess of the ALJ's RFC finding."  (ECF No. 11, PageID.739; *see also* ECF No. 14, PageID.780-82).  The ALJ expressly noted that Dr. Connor "indicated there may be non-organic factors affecting [Dibella's] cognitive efficiency, including chronic pain, stress/anxiety, [and] low mood," but ultimately determined that the exam "confirmed normal cognitive functioning." (PageID.52).  Substantial evidence also supports the ALJ's assessment of Dr. Connor's evaluation because Dr. Connor specifically concluded that Dibella's "neurocognitive

profile was ***largely within expectations*** for her age and level of education," and that any "difficulties on testing are thought to represent ***normal cognitive variability*** in an assessment battery of this size, and are most likely longstanding relative weaknesses given her history of academic problems and repeating a grade with special education . . ." (PageID.416) (emphasis added).  Dr. Connor further noted that, while Dibella "reported primary concerns regarding subjective attention and memory difficulties, [] her performance in these domains were ***entirely within normal range***," and that Dibella's "subjective cognitive concerns are likely related to her own awareness of ***normal age-related cognitive decline***."  (*Id.*) (emphasis added).  Notably, "there [was] ***no indication of neurodegenerative process*** at this time," and "[o]n an objective measure of personality and psychological functioning, validity indicators were ***within normal range***." (PageID.416, 422) (emphasis added).[4]

In short, Dr. Connor's assessment that Dibella's "neurocognitive profile was largely within expectations" based on neuropsychological findings generally within "average" to "normal range" provides substantial evidence for the ALJ's RFC finding that Dibella had no more than "minimal" mental limitations.  *See Biestek*, 139 S. Ct. at 1154 (substantial evidence is merely "such relevant evidence as a reasonable mind might accept as adequate

---

[4] As for recommendations, Dr. Connor made clear from the start that Dibella "should be *reassured* by [the results of her neuropsychological evaluation], as her memory performances are *normal* for her age, and there is no sign of early dementia." (PageID.416) (emphasis added).  Dr. Connor also suggested that "*[r]egular social engagement and involvement in mentally-stimulating activities are also recommended*."  (PageID.417).  Even her recommendation to "[a]void multi-tasking whenever possible" and "[a]llow extra time to complete tasks and take regular breaks to maximize cognitive efficiency" appear to be general strategies that "can be useful even for those with *normal cognitive functioning*." (PageID.417) (emphasis added).  Dibella fails to explain, much less prove, how such recommendations are inconsistent with, or in excess of, the ALJ's RFC finding.

to support a conclusion"). Accordingly, Dibella fails to show any reversible error in the ALJ's assessment of Dr. Connor's neuropsychological evaluation.

### 2. Substantial Evidence Supports the ALJ's Assessment of Medical Opinions from Dr. Csokasy and Dr. Job

Dibella next challenges the ALJ's assessment of medical opinions from (1) state agency consultant Dr. Jerry Csokasy, PhD, and (2) her primary care physician, Dr. Prizy Job, MD. For the reasons discussed below, substantial evidence supports the ALJ's assessment of these medical opinions.

### i. Dr. Csokasy's September 10, 2019 Opinion

On September 10, 2019, Dr. Csokasy assessed that Dibella had (1) "mild" limitations as to her ability to understand, remember, or apply information; interact with others; and adapt or manage oneself; but (2) "moderate" limitations as to her ability to concentrate, persist, or maintain pace. (PageID.125). Under "Additional Explanation," Dr. Csokasy noted portions of Dr. Connor's neuropsychological evaluation, including that Dibella exhibited an "up and down" mood and was "observed to be anxious throughout the [] interview and during testing," but was otherwise "alert and oriented x4," her "thought processes were linear and goal directed," her "performance on formal and embedded measures of task engagement fell within acceptable limits, indicating adequate engagement and effort," and, ultimately, her "neurocognitive profile was largely within expectations for her age and level of education." (*Id.*). Finally, Dr. Csokasy noted that "ADLs indicate difficulty with memory, understanding, & following instructions. Doesn't handle[] stress or changes well." (*Id.*). In conclusion, he opined that, "[g]iven overall evidence, [Dibella]

13

is able to perform simple/routine tasks on a sustained basis in low stress environment."

(*Id.*).

The ALJ found Dr. Csokasy's opinion "to be of little persuasive value," based on

the following reasons:

> The opinion of Dr. Csokasy, regarding the claimant's mental
> limitations[] was less persuasive.  Specifically, Dr. Csokasy found the
> claimant to be moderate[ly] limited in her ability to concentrate, persist
> and maintain pace, resulting in a recommendation that the claimant is
> limited to the performance of simple routine tasks in a low stress
> environment.  However, this opinion appears to be based solely on the
> claimant's allegations rather than the clinical findings of the
> neuropsychological evaluation which had been performed just two
> months earlier.  Furthermore, a more longitudinal view of the record
> supports the claimant's decision to cease formal mental health treatment
> due to improvement in symptoms.  Later evaluations from other treating
> physicians do not support significant symptoms of anxiety which would
> support the limitation proposed by Dr. Csokasy.  Accordingly, the
> undersigned finds his opinion to be of little persuasive value.

(PageID.57) (citations omitted).

In her motion, Dibella contests the ALJ's statement that Dr. Csokasy's opinion

"appears to be based solely on the claimant's allegations," arguing that the "ALJ does not

state her basis for such a conclusion, and there does not appear to be any" because Dr.

Csokasy "also summarized various findings from the from the neuropsychological

examination and these were cited in all caps, suggesting they weighed heavily on Dr.

Csokasy's opinion."  (ECF No. 11, PageID.741; *see also* ECF No. 14, PageID.777-78).

The Commissioner responds that substantial evidence supports the ALJ's assessment that

"Dr. Csokasy expressly relied on [Dibella's] own report about her limitations," but that her

"self-report was inconsistent with the clinical findings of the neuropsychological

evaluation which has been performed just two months earlier."  (ECF No. 13, PageID.766) (quotations and citations omitted).  The Court agrees with the Commissioner on this point.

Here, substantial evidence supports the ALJ's conclusion that Dr. Csokasy's opinion "appeared to be based 'solely' on Dibella's subjective allegations rather than the clinical findings."  (ECF No. 11, PageID.741); *see Biestek*, 139 S. Ct. at 1154.  To begin, Dibella acknowledges that "Dr. Csokasy's explanation for his finding did cite to [her] subjective 'ADL' reports."  (ECF No. 11, PageID.741).  Specifically, in his "Findings of Fact and Analysis of Evidence," Dr. Csokasy noted next to "ADLs" that Dibella reported she "[c]an't focus/concentrate," has "[d]ifficulties [with] memory, understanding, following instructions," and "[d]oesn't handle[] stress or changes well."  (PageID.123). But, significantly, these self-reported limitations noted in the "ADLs" are inconsistent with both Dr. Csokasy's summary of Dr. Connor's neuropsychological exam and the findings in that actual exam itself, which reflect a normal range of cognitive functioning, including that Dibella was "alert and oriented x4," her "thought processes were linear and goal directed," her "performance on formal and embedded measures of task engagement fell within acceptable limits, indicating adequate engagement and effort," and her "neurocognitive profile was largely within expectations for her age and level of education." (PageID.125).  While Dibella was noted as having an "up and down" or "anxious" mood, she again fails to explain, much less prove, how an observation of an anxious or up-and-down mood specifically required the ALJ to find that she is limited to working in a "low stress environment" and "moderately" limited in concentration, persistence, and maintaining pace.  *See Lee*, 2020 WL 1139710, at *6 (stating the claimant "bears the

burden of proving the existence and severity of limitations caused by [her] impairments" and "that [s]he has a more restrictive RFC than that assessed by the ALJ").

In short, given the inconsistencies between Dr. Csokasy's summary of Dr. Connor's neuropsychological evaluation and the subjective allegations noted in the "ADLs," it was reasonable for the ALJ to conclude that Dr. Csokasy's opined limitations were not based on the neuropsychological evaluation, but rather Dibella's self-reported limitations in her "ADLs."[5]  This analysis comports with 20 C.F.R. § 404.1520c(b)(2)'s directive that "the most important factors" in evaluating a medical opinion are its supportability and consistency with other sources in the record.   20 C.F.R. § 404.1520c(b)(2).   Thus, substantial evidence supports the ALJ's assessment of Dr. Csokasy's opinion, and Dibella fails to show any error in this regard.

*ii.  Dr. Job's May 31, 2019 and October 10, 2019 Opinions*

The record contains two opinions from Dr. Job.  Relevant to Dibella's mental

---

[5] Dibella's other arguments also lack merit.  First, her assertion that "[t]he ALJ's failure to mention [the findings in the neuropsychological exam] implies she did not factor them into her own reasoning" (ECF No. 11, PageID.741), is belied by the ALJ's statement that Dr. Csokasy's opinion "appears to be based solely on the claimant's allegations ***rather than the clinical findings of the neuropsychological evaluation*** which had been performed just two months earlier," *i.e.*, Dr. Csokasy's opinion is inconsistent with such clinical findings.  (PageID.57) (emphasis added).  Second, to the extent she contends it was "inaccurate" to "suggest[] that [she] improved with treatment and that the 'record supports the claimant's decision to cease formal treatment'" because she later complained of worsening anxiety (ECF No. 11, PageID.741), not only does Dibella fail to challenge the ALJ's assessment of her subjective complaints as inconsistent with the objective medical evidence, substantial evidence also supports the ALJ's conclusion that "[l]ater evaluations from other treating physicians do not support ***significant symptoms*** of anxiety which would support the limitation proposed by Dr. Csokasy" (PageID.57) (emphasis added), based on the predominantly normal neuropsychological findings throughout Dibella's treatment notes, except for an "anxious" mood, which "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863.

limitations, Dr. Job first opined on May 31, 2019 that Dibella has a "mental" impairment that "substantially limit[s]" her ability for "stress management," her "anxiety makes it difficult to handle stressful situations," and her "stress exacerbates anxiety." (PageID.699-700). Second, on October 10, 2019, Dr. Job similarly opined that Dibella has a "mental" impairment that "limit[s]" her "stress management," her "anxiety" made it "hard [for her] to handle stressful situations," and her "stress causes anxiousness." (PageID.695-96).

The ALJ found Dr. Job's opinions to be "minimally persuasive," explaining:

> In addition to the above-discussed treatment records, Dr. Job provided medical source statements on May 31, 2019 and October 10, 2019. In these statements, the doctor indicated that the claimant could not bend, lift heavy objects, or sit and stand for prolonged periods due to back pain. She also set forth that claimant would miss three consecutive days of work one to two times per month because of "flare ups." The undersigned finds that Dr. Job's statements are minimally persuasive. Although Dr. Job has a treating relationship with the claimant, these statements are not at all consistent with the doctor's clinical findings. Specifically, Dr. Job's records do not support any clinical observations.

(PageID.56) (citations omitted).

In her motion, Dibella argues that the ALJ provided "scant reasoning" for finding minimally persuasive Dr. Job's opinion that she "had a mental impairment, that anxiety impacted her stress management, and that she had difficulty handling stressful situations due to her anxiety." (ECF No. 11, PageID.742). The Commissioner responds that substantial evidence supports the ALJ's sufficiently articulated assessment that Dr. Job's "proposed limitations were not supported by the doctor's own clinical findings" and inconsistent with the objective medical record in which "no other treating provider had assessed any functional limitations." (ECF No. 13, PageID.768-70). As explained below,

while the ALJ's discussion of this particular issue could have been more explicit, Dibella fails to show any reversible error in the ALJ's overall assessment of Dr. Job's opinion.

First, Dibella argues that the ALJ's reasoning is "misleading" and "based on an incomplete review of the record." (ECF No. 11, PageID.742). Specifically, she contends that (1) while "[t]he ALJ cites to exhibit 5F at p.6 [(PageID.432)] to support that the record contained no clinical observations . . . there appears to be no category for any psychological observations in the report the ALJ cited, making it unclear whether Dr. Job noted psychiatric abnormalities at this visit or not"; and (2) "[t]he ALJ's general citation to exhibit 15F [(PageID.702-17)], overall, is also somewhat misleading considering this was a telemedicine visit due to COVID, and presumably Dr. Job could not perform a full physical examination to even note certain clinical findings." (ECF No. 11, PageID.742). These arguments lack merit, as substantial evidence supports the ALJ's assessment of the above-contested treatment notes, which expressly document "*objective*" findings on "Neurological" exams indicating that Dibella's "mental status" was "alert and oriented to person, place, and time" with no other remarkable findings, despite *subjective* reports of "worsening anxiety." (PageID.432, 703-04) (emphasis added).

Next, Dibella's arguments – that the ALJ "ignore[d] that . . . Dr. Job noted [] Dibella's mood was 'anxious' on objective examination [on February 9, 2019]," and that "it's not clear" whether the ALJ "addressed both the 'supportability' and 'consistency' of [Dr. Job's] opinions" as required by the regulations – also fail. (ECF No. 11, PageID.743-44) (citing PageID.356). A review of the ALJ's decision makes clear that she reasonably found Dr. Job's opinions were "not at all ***consistent*** with the doctor's clinical findings" and

"do not **support** any clinical observations."   (PageID.56 (emphasis added); *see also*
PageID.54 ("To date, no other doctor other than Dr. Job has provided any restriction on the
claimant's functionality").   Again, Dr. Job's findings on neurological exams – including
the specific one referenced by DiBella – indicate that Dibella's "mental status" was "alert
and oriented to person, place, and time."  (PageID.356, 432, 703-04).

Moreover, Dibella's reliance on the single instance in which Dr. Job observed an
"anxious" mood in February 2019 (PageID.356) is particularly unavailing where treatment
notes by Dr. Job and other providers predominantly assessed normal cognitive functioning
based on consistently unremarkable findings as to her orientation, attention span,
concentration, memory, fund of knowledge, insight, and judgment – despite the presence
of an "anxious" mood.  (PageID.434-35, 666-67, 679, 683, 687, 691; *see also* PageID.416,
419 (neurocognitive testing confirming "attention and memory [] were entirely within
normal range" *despite* reported anxiety).

Accordingly, substantial evidence supports the ALJ's assessment of Dr. Job's
opinion, and Dibella fails to show any error warranting remand in this regard.

### 3.  *Substantial Evidence Supports the ALJ's RFC Determination*

Finally, Dibella presents a cursory argument that "remand for further consideration
is required" because "the ALJ's decision does acknowledge the existence of anxiety
resulting in at least *mild* limitations in understanding, remembering, and applying
information and concentrating, persisting, and maintaining pace [] [y]et there is no
evidence that [the ALJ] considered any such limitations in the RFC finding[.]"  (ECF No.
11, PageID.746) (emphasis added).  This argument lacks merit.

"The RFC does not need to reflect impairments if the record supports a finding that the impairments do not result in functional limitations." *Mehay v. Comm'r of Soc. Sec.*, No. 19-12991, 2021 WL 1175285, at *5-6 (E.D. Mich. Mar. 29, 2021).  Indeed, the Sixth Circuit has made clear that "[t]he RFC describes the claimant's residual abilities or what a claimant can do, ***not what maladies a claimant suffers from*** . . . A claimant's severe impairment may or may not affect his or her functional capacity to do work.  One does not necessarily establish the other." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (emphasis added) (quotations and citations omitted).

Here, the ALJ's decision clearly found that Dibella's ***non-severe*** impairment of "***anxiety does not cause more than minimal limitation*** in [her] ability to perform basic mental work activities," that "there is ***no clinical or objective support that her symptoms ever persist at a level severe enough*** to prevent her from working on a sustained and consistent basis," and that "limiting [Dibella] to work within ***the above-defined [RFC] sufficiently accommodates any limitations r****esulting from her impairments* and is entirely consistent with the record as a whole."  (PageID.51, 57-58) (emphasis added).

Moreover, Dibella's assertion that "there is no evidence" that the ALJ considered the "mild limitations" assessed as a result of her anxiety is simply incorrect.  In addition to the ALJ's above-referenced statements which demonstrate her consideration of this issue, in addressing the RFC, the ALJ also stated that she had carefully considered "all symptoms" in "the entire record" and based her conclusion on the "totality of the evidence."  (PageID.53-54).  The ALJ also cited to 20 C.F.R. § 416.945 and SSR 96-8p, stating that, "in making [the RFC] finding, [she] must consider all of claimant's

20

impairments, *including impairments that are not severe*," *i.e.*, Dibella's anxiety. (PageID.58-59) (emphasis added); *see Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851 (concluding that an ALJ's specification in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to consider all impairments supported the conclusion that she had complied); 20 C.F.R. § 416.945 (stating that all medically determinable impairments, including those that are "not 'severe'" will be assessed in combination).  Particularly given the ALJ's thorough discussion of the record evidence, this is sufficient.  *See Emard*, 953. F.3d at 851 ("[T]he ALJ's statements that she had considered the entire record and all of [claimant's] symptoms suggest that she had considered [claimant's] impairments in combination.") (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 591-92 (6th Cir. 1987)).  Finally, the ALJ made clear that, while "[t]he limitations defined in the 'paragraph B' criteria are not a [RFC] assessment," the "***[RFC] assessment reflects the degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis***."  (PageID.53) (emphasis added).

As to specifics, the ALJ expressly considered Dibella's non-severe impairment of anxiety and her reported symptoms.  (*See* PageID.51 ("anxiety does not cause more than minimal limitation in [Dibella's] ability to perform basic mental work activities and is therefore non-severe.").  However, the ALJ found that her reported symptoms were not consistent with the totality of evidence contained in the record.  (PageID.54; *see also, e.g.,* PageID.53 (testimony that concentration and stress causes problems at work "is simply not supported by the medical evidence, and is inconsistent with the reports from Ms. Sattler"); PageID.56 ("while [Dibella's friend] Ms. Mcveogh's observations are consistent with

[Dibella's allegations], they are simply not consistent with the objective medical evidence of record [.]").  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints").

The ALJ also noted Dibella's treatments with her counselor, Ms. Sattler, on August 19, 2019, during which Dibella presented with an "anxious mood," but had a mental status exam that was "completely unremarkable," and was recommended "nothing more than outpatient psychotherapy." (PageID.51-52; *see* PageID.446-47 (psychiatric exam finding "good hygiene & grooming," "alert" attitude & behavior, "no abnormal movements," speech was "normal rate, normal volume, normal articulation, coherent, spontaneous," language was "fluent" and "normal," "normal" though process, "good" insight and judgment)).  The ALJ noted Dibella's continued treatment with Ms. Sattler through October 2019, during which mental status exams "remained unchanged," and she reported "anxiety secondary to financial stressors and living with her verbally abusive father," but through therapy, was able to "improve her relationship with her father." (PageID.52; *see* PageID.432-34, 683-84, 686-88, 690-92).  Overall, the ALJ found that, throughout her treatments, "the only positive clinical finding was an anxious mood," and Dibella otherwise consistently "exhibited intact memory, cognition, concentration, behavior" and her "symptoms and clinical presentations remained stable." (*Id.*).

To add further, the ALJ discussed Dibella's neuropsychological exam with Dr. Connor, and found that the exam "confirmed normal cognitive functioning." (PageID.52). The ALJ also determined Dibella had "no limitations in the domain of interacting with others" based her statements in her Function Report and hearing testimony that she

regularly spent time at a friend's house, volunteered in the community, and sometimes ran errands for people.   (PageID.52; *see* PageID.79-80 (hearing testimony that Dibella "volunteer[s]" in friend's "ministry," which includes "shopping" and getting "some groceries" for friends); PageID.290, 293 (Function Report stating "everyday hang with friends," "speak on phone, hang out at friend's house, watch movies, go to mall," regularly go to "church, friend's house, family functions")).   The ALJ considered that Dibella was only prescribed "five pills of [Xanax] per month," and that by October 9, 2019, Dibella told Ms. Sattler "she felt ready to end treatment, and felt confident in the coping skills given to her."   (PageID.52; *see* PageID.690 ("Client feels ready to end treatment")).   Based on all of the foregoing, the ALJ determined that Dibella's testimony – that "her concentration interferes with her current work, and that stress causes her to make a lot of mistakes at her job" – was "simply not supported by the medical evidence, and is inconsistent with the reports from Ms. Sattler."   (PageID.52-53).   Accordingly, the ALJ reasonably concluded that "the record as a whole supports that [Dibella] remains capable of performing her past relevant work," and that, "in comparing [Dibella's RFC] with the physical and mental demands of this work," Dibella is "able to perform both jobs as actually and generally performed."   (PageID.58).[6]

---

[6] The record regularly contains objective medical evidence of normal exam findings as it relates to her mental functional capacity – despite observations of "anxious" mood – throughout the relevant period.   (*See, e.g.*, PageID.435, 438 (judgment and insight intact, mood and affect normal, alert and oriented, fluent speech in August 2019); PageID.445-46, 666 (normal findings with "good" prognosis in August 2019); PageID.433-34, 679 ("normal rate of thoughts, normal abstract reasoning, normal computation," "intact associations," "[no] abnormal thoughts," oriented to "time place, person, context," "normal attention span," "normal recent memory," "good" insight and judgment in August 2019); PageID.682, 687 (same normal findings with "slowly improving" progress and "good" overall prognosis in September 2019); PageID.691 ("Client feels ready to

In short, Dibella fails to show any reversible error based on the ALJ's thorough review and consideration of evidence related to her anxiety and the associated symptoms/effects in assessing the RFC, which is supported by substantial evidence. *See Anthony*, 266 F. App'x at 457. Again, it is Dibella who bears the burden of establishing her functional limitations, but she simply fails to prove the existence and severity of any such limitations the ALJ should have assessed based on her non-severe impairment of anxiety. *Lee v. Comm'r of Soc. Sec.*, No. 19-10337, 2020 WL 1139710, at *6 (E.D. Mich. Mar. 9, 2020) (stating the claimant "bears the burden of proving the existence and severity of limitations caused by [her] impairments" and "that [s]he has a more restrictive RFC than that assessed by the ALJ") (citing *Jones*, 336 F.3d at 474, and *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)).

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 13)** be **GRANTED**, Dibella's Motion for Summary Judgment **(ECF No. 11)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.

Dated: July 29, 2022                                  s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                            United States Magistrate Judge

---

end treatment" despite "anxious" mood in October 2019); PageID.704 (alert and oriented times three in June 2020).

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 29, 2022.

s/Marlena Williams
In the absence of EDDREY O. BUTTS
Case Manager
